UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRIAN GORNE and ADRIENNE WALKER,

Plaintiffs,

vs.

UBER TECHNOLOGIES, INC., a Delaware
Corporation, AND
THE FIRST DOE THROUGH ONE
HUNDREDTH DOE, INCLUSIVE,

Defendants.

No. 2:19-cv-01138

**COMPLAINT FOR DAMAGES**:

JURY DEMAND

## I.   CIVIL COMPLAINT

1.1 Plaintiffs BRIAN GORNE and ADRIENNE WALKER (Plaintiffs), by and through their undersigned attorneys, hereby bring this Complaint for damages against Defendants Uber Technologies, Inc., and Does 1-100 (collectively, Defendants) and allege the following:

## II.   NATURE OF THE CASE

2.1 This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendants' negligent and wrongful conduct. This action arises out of an incident that occurred on October 1, 2017, in Seattle, Washington.  On that evening, Plaintiff Brian Gorne was violently stabbed by an Uber Technologies, Inc. (hereinafter, "Uber") driver named Sharif Soajima a/k/a Timothy Clark (Soajima).

2.2  Since its founding in San Francisco in 2010, Uber has grown rapidly into a multi-billion dollar enterprise with operations worldwide.  Uber's phenomenal growth is due in large part to its lax hiring and security screening processes and evasion of regulations.

2.3  For example, Soajima began driving for Uber sometime in 2016.  Uber retained Soajima's services to drive for it despite the fact that he had served substantial jail time for several

**WEINSTEIN CAGGIANO PLLC**
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

violent felonies including, assault in the 1st degree with a deadly weapon, and in another incident, armed robbery.

2.4 At the time Uber retained Soajima to drive, it was well aware that it had numerous convicted felons already driving for it. In 2014, Uber had been sued by the District Attorney of San Francisco and Los Angeles regarding a "Safe Rides Fee" discussed in detail below. In their Complaint, the District Attorneys noted that Uber's screening process was deficient in that individuals passed Uber's screening process and were driving for Uber with the following felony convictions: (1) second degree murder; (2) lewd and lascivious acts against a child under the age of 14, (3) sexual exploitation of children; (4) kidnapping for ransom with a firearm; (5) assault with a firearm; (6) grand theft; (7) robbery; (8) identity theft; (9) burglary; and (10) taking a vehicle without consent.

2.5 Similarly, in January of 2017, the State of Massachusetts subjected Uber and Lyft drivers to state-run background checks. This screening was intended for drivers that had already passed Uber's background check. In April of 2017, it was announced that more than 8,000 drivers had failed the state screening. Of those 8,000 drivers rejected, almost 1,600 of them were rejected because they were found to have a history of violent crimes. Uber's background checks also failed to identify 51 registered sex offenders in the state of Massachusetts alone

2.6 Despite the fact that Uber knows that it employs violent felons, Uber still fraudulently markets itself as a safer, better alternative to other methods of transportation, particularly targeting vulnerable late-night riders.

2.7 Uber's conduct evidences a conscious attitude and corporate policy of "profits over people" characterized by a willful and knowing disregard of the rights and safety of others so base and contemptible as to be looked down on and despised by reasonable people.

### III.    JURISDICTION AND VENUE

3.1 Personal jurisdiction over the Defendants exists as Defendants conducted substantial business activities in Washington and this cause of action arises out of these business activities.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

3.2 This Court has diversity jurisdiction under U.S.C. § 1332 over the above-captioned cause because the amount in controversy exceeds $75,000.00 and the Plaintiffs and Defendants are residents of different states.

3.3 Plaintiffs Brian Gorne and Adrienne Walker are residents of King County, Washington.

3.4 Defendant Uber Technologies, Inc is a Delaware Corporation with its principal place of business in San Francisco, California.

## IV.   **PARTIES**

4.1 Plaintiff Brian Gorne and Adrienne Walker are husband and wife and are residents of Seattle, King County, Washington.   At all times referenced herein, Plaintiff Brian Gorne and Plaintiff Adrienne Walker were legally married.   Plaintiffs were residents of Seattle, Washington, at the time of the incident.   Plaintiffs bring this action for personal injuries sustained by Mr. Gorne when he was stabbed by an Uber driver. As a direct and proximate result of this stabbing, Brian Gorne and his wife Adrienne Walker have sustained general damages as said forth further below.

4.2 Defendant Uber Technologies, Inc. is a Delaware Corporation with its principal place of business at 1455 Market Street, Fourth Floor, San Francisco, California 94103.   Uber operates throughout the United States and internationally in over 500 cities, including Seattle, Washington.

4.3 The true names and capacities, whether individual, corporate, associate, governmental or otherwise, of defendants First DOE through One Hundredth DOE, inclusive, are unknown to Plaintiffs at this time, who therefore sue said defendants by such fictitious names.   When the true names and capacities of said defendants have been ascertained, Plaintiffs will amend this complaint accordingly.   Plaintiffs are informed and believe, and thereon allege, that each defendant designated herein as a DOE is responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to the Plaintiffs, as hereinafter alleged.

///

///

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

## V.     <u>GENERAL ALLEGATIONS</u>

**A.    Background**

5.1 Uber is a global online transportation company headquartered in San Francisco, California. Uber is the creator and provider of a downloadable software application known as the Uber application that allows customers to request a ride comparable to a taxi with the push of a button on a smartphone (the "Uber App").

5.2 The purpose of the Uber App is to connect Uber approved drivers with members of the public in need of transportation. Once a consumer requests a ride through the Uber App, an approved Uber driver in the vicinity "accepts" the request and the App displays an estimated time of arrival for the Uber driver to arrive at the consumer's pickup location. The Uber App notifies the consumer when the driver is about to arrive and it provides general information about the driver, including the driver's first name, vehicle type, license plate number, and driver rating.

5.3 The rider then enters the preferred destination, which the rider can do before or during the ride. Upon arriving at a destination, the fare is automatically calculated and charged to the payment method linked to the rider's Uber account, typically a credit card.

5.4 Uber offers a variety of transportation options that are differentiated by the size and type of the vehicle or number of riders. This includes a standard option called "UberX," as well as higher cost options such as UberXL, UberSelect, and UberBlack. Uber charges different fares depending on the type of option a consumer orders from the App. For all of these options, Uber represents that its drivers are "thoroughly screened through a rigorous process we've developed using industry leading standards."

5.5 Uber's business model requires an enormous pool of drivers in order to provide rides to customers quickly and efficiently. To accomplish this, Uber solicits and retains hundreds of thousands of drivers. Uber markets to potential drivers: "Uber makes it easy to earn money driving your car on your schedule. With so many riders in every city, there's opportunity at every turn."

5.6 Uber's business model also depends on willing riders. Since its inception in 2010, Uber has aggressively marketed itself as a more efficient and safer alternative to public transportation

**WEINSTEIN CAGGIANO PLLC**
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON 98101
(206) 508-7070 · FACSIMILE (206) 237-8650

and traditional taxis. Uber has also targeted specific groups of vulnerable riders who place a premium on safety, including women and intoxicated late-night riders.

5.7 These efforts have proved wildly successful. Uber has grown rapidly into a multi-billion-dollar enterprise with operations worldwide. In October 2016, Uber's CEO indicated that the company provides its services to over 40 million active riders monthly, and Uber riders spend $50 on average on the service every month. Uber has recently been valued at approximately $80 billion and Uber expects its valuation to exceed $90 billion when it starts selling shares later this summer, making it one of the largest initial public offerings in the history of the technology industry.

**B.      Uber's Terms and Conditions**

a) <u>**Consumers Are Not Required to or Asked to Read the Terms and Conditions of the App**</u>

5.8 The following facts pertain to all relevant times to this matter—including when Mr. Gorne downloaded the Uber app in or around 2014. When a prospective passenger signs up for Uber's services, he is prompted to enter information into a few screens.

5.9 On the first screen, he is prompted to enter an email, a mobile number, and a password. There is "helper text" at the bottom of the screen that provides an explanation for why the information sought in the form is needed, stating: "We use your email and mobile number to send you ride confirmation and receipts."

5.10 On the second screen, he is then also prompted to enter a full name and a photo. The helper text on this screen states: "Your name and photo helps your driver identify you at pickup."

5.11 On the final screen, he is prompted to enter a credit card number. The helper text on this screen states: "By creating an Uber account, you agree to the Terms & Conditions and Privacy Policy."

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

5.12 Importantly, there is no indication to the prospective passenger that the text of "Terms & Conditions and Privacy Policy" is a link that can be clicked and that will lead to the full text of the Terms and Conditions.

5.13 There is no information about the "Terms & Conditions and Privacy Policy" on the prospective passenger's screen and no prompt is provided to suggest that he should open any link.

5.14 Indeed, the text "Terms & Conditions and Privacy Policy" is in a lighter, lower contrast font as compared to the other helper text, further obscuring its significance.

5.15 The helper text on each of the three screens is in an identical location—toward the bottom of the screen.

5.16 To advance past the final screen, where the credit card number is entered, again, there is no requirement to review the Terms & Conditions and Privacy Policy.

5.17 Instead, the button at the top of the screen merely says "Done" and only indicates advancing though the process for each screen.

b) **Passengers Did Not Agree to the Terms and Conditions**

5.18 At no point did Mr. Gorne assent or agree to the Terms and Conditions to the app.

5.19 There is no statement that clicking "Done" signifies assent to the purported contract implied in the Terms and Conditions.

5.20 Once the prospective consumer advances though the third screen, where he has entered his credit card number, he has created an account with Uber and the application is complete.

5.21 There is no indication that by selecting the "Done" button in the final screen, the prospective consumer is also assenting to the Terms and Conditions, or even any clear indication that selecting "Next" is the final step to account creation.

5.22 At no point prior to October 2017 was Mr. Gorne required to open a link to the Terms and Conditions.

5.23 At no point prior to October 2017 was Mr. Gorne required to view the Terms and Conditions.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

5.24 At no point prior to October 2017 was Mr. Gorne required to check a box that says "I Agree" to the Terms and Conditions.

5.25 At no point prior to October 2017 was Mr. Gorne required to indicate that he had asserted to the Terms and Conditions.

5.26 At no point prior to October 2017 was Mr. Gorne required to affirm that he had even read the Terms and Conditions.

5.27 The full text of the Terms and Conditions are never provided to the prospective consumer during the process of signing up for an account.

5.28 The Terms and Conditions are never emailed to the prospective consumer, at account creation or otherwise.

5.29 The Terms and Conditions are never mailed to the prospective consumer, at account creation or otherwise.

5.30 During the account creation process, the prospective consumer can only click through an optional link to view the Terms and Conditions through the screen on which the credit card number is entered.

5.31 Once the account is created, to access the Terms and Conditions within the app, a consumer is required to click first on a menu button, sift through multiple pages and links in order to find a "Legal" link under the menu sidebar.

5.32 Once in the "Legal" section, a consumer can access some version of Uber's Terms and Conditions.

5.33 After clicking on "Terms & Conditions" in the app, the default set of terms and conditions that comes up is for Australia.

5.34 The font in which the Terms and Conditions are printed is microscopic.

5.35 The default Terms and Conditions consist of 4,604 words and 68 paragraphs of legalese.

5.36 To access Terms and Conditions that would purportedly bind individuals in countries other than Australia, one must identify and then use a drop-down menu to find the relevant country.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

5.37 There is no direct link in Uber's Terms and Conditions on the homepage of the Company's website.

5.38 In order to find the Terms and Conditions, one must first click on a sidebar labeled "Menu." The Terms and Conditions are no available through links such as "About Us," "Safety" or "Help Center."

5.39 Indeed, typing in "Terms and Conditions" into the search field in "Help Center" only yields the result of "Girt Cards Terms and Conditions."

5.40 In order to find the Terms and Conditions, a prospective user must sift through multiple pages and links in order to find the "Legal" link under the "Menu" sidebar.

5.41 The Terms and Conditions to which a prospective consumer in the United States would be bound has an arbitration provision that, upon a recent revisions of the Terms and Conditions, in now highlighted in the first section, but has previously been buried as far down as numbered item 6—"Dispute Resolution."

5.42 When viewing the Terms and Conditions in the app, a user must scroll through approximately seven (7) full pages of microscopic text to reach the "Dispute Resolution" provision.

**c)** **Because Passengers Never Assented to the Terms and Conditions, They are Not Binding**

5.43 Based on the foregoing, Mr. Gorne was not provided conspicuous notice of the existence of alleged contract terms when he downloaded the app.

5.44 At all relevant times, Mr. Gorne was not required to, and nor did he, review the Terms and Conditions of the app.

5.45 Similarly, Mr. Gorne was not required to, and nor did he, click the link and review the provisions located within the "Terms & Conditions and Privacy Policy."

5.46 Mr. Gorne was not required to check a box that affirmed that he "agreed" to the Terms and Conditions when he downloaded the app.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

5.47 Uber failed to properly notify its consumers, including Mr. Gorne, when modifications were made to the Terms and Conditions. Through his continued use of the app, Mr. Gorne was not required, nor did he, affirmatively agree to the Terms and Conditions of the app.

5.48 At all relevant times, Uber never mailed or emailed Mr. Gorne a copy of the Terms and Conditions.

**d)   Uber Retained the Right to Unilaterally Change the Terms and Conditions of the App**

5.49 At all relevant times, including when Plaintiff downloaded the app, the Terms and Conditions contained language purporting to grant Uber the unilateral right to modify the agreement.

5.50 Pursuant to the Terms and Conditions, Uber provided itself with the exclusive ability to alter allegedly binding agreement terms and simultaneously removed any obligation to send notice to consumers regarding modifications.

5.51 Uber simply included a provision in the Terms and Conditions that contractual changes are effective once posted on its website, http://www.uber.com/legal.

5.52 In the Terms and Conditions, Uber requires arbitration for any claims that arise out of the use of the app. It excludes from arbitration claims any brought "to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights."

5.53 Upon information and belief, Uber's arbitration provision excludes the types of claims Uber is most likely to bring against others, while requiring arbitration for the types of claims most likely to be brought against Uber.

5.54 Recovery is also severely limited by Uber's Terms and Conditions.

5.55 According to the Terms and Conditions, Uber's liability for any and all damages and losses incurred cannot exceed $500.

**C.     Uber's Business Model Requires a Large Pool of Drivers**

5.56 Uber's business model depends on having a large pool of drivers so that customers can secure rides in a matter of minutes. As such, the application process to become an Uber driver

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

is simple, fast, and designed to allow Uber to hire as many drivers as possible while incurring minimal associated costs.

5.57 There are no specialized skills needed to drive for Uber. By Uber's own admission, "anybody" can drive for Uber if they meet the minimum requirements of being over 21 years of age with a valid U.S. driver license, at least one year of driving experience in the U.S., and an eligible four-door vehicle. Uber does not charge a fee for driver applications.

5.58 In order to become a driver for Uber, individuals apply through Uber's website. The application process is entirely online and involves filling out a few short forms and uploading photos of a driver's license, vehicle registration, and proof of insurance. Uber does not verify that the documents submitted are accurate or actually pertain to the applicant.

5.59 Uber does not verify vehicle ownership. Rather, it only requires that the vehicle is registered and is not more than ten years old.

5.60 Uber does not require driver applicants to attend training classes on driving skills or using mobile applications while driving. Uber drivers are not required to pass road vehicle tests or vision and hearing exams.

5.61 In addition to a simple, online application process, Uber entices individuals to become drivers by advertising and marketing the earning potential of its drivers. Uber has publicized high annual and hourly earnings for its drivers on Craigslist, its company website, and other advertising and marketing media.

5.62 Uber's efforts recruiting drivers has been a success. In 2015, the number of active Uber drivers grew from 160,000 to 400,000. By mid-2016, that figure had grown to over 650,000 drivers. While Uber remains secretive of how many drivers they have under their platform, it is estimated that in 2019, there are over two million people driving for Uber worldwide, with one million of those drivers based in the United States.

**D.    Uber is a Common Carrier**

5.63 Uber offers to carry and transport members of the general public and holds itself out to the public as an on-demand form of transportation available to anyone who wants to use it.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON 98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

5.64 Uber provides a similar service to taxis and competes with taxi services in providing transportation to members of the public.

5.65 As of May of 2017, Uber had provided five billion rides to members of the public. Because of Uber's rapid expansion, three billion of those rides had occurred between December 31, 2015 and May 20, 2017.  This meaning the company was providing an average of 5.9 million rides a day, or 247,000 rides an hour during this 17-month period alone.

5.66 Uber is available to the general public through the Uber App available for anyone to download with a smartphone. Neither drivers nor riders are charged a fee to download the Uber App. Uber's primary source of revenue is from charging its customers for transportation.

5.67 By its own admission, Uber wants to be available for "everyone." Uber policy prohibits drivers from refusing to provide services based on race, religion, national origin, disability, sexual orientation, sex, marital status, gender identity, age or any other characteristic protected under relevant federal, state or local law. Uber has held itself out as "Everyone's Private Driver."

5.68 Uber policy prohibits drivers from refusing to provide services based on the rider's destination. By its own admission, "Uber provides safe, affordable rides around the clock— regardless of where you live, where you're going, or what you look like."

 5.69 Uber has further advertised: "**No discrimination**. No ride is too long or too short. All requests are blindly matched based on the closest available driver-partner, meaning that there is no discrimination based on race, gender, or pick-up or drop-off location. Day or night, people can safely get to their destination, even if it is hard to reach."

5.70 Uber charges customers standardized fees for car rides, setting its fare prices without driver input. Drivers may not negotiate fares.

5.71 In 2015, Uber's CEO stated that in San Francisco alone, its most mature market, Uber's revenue was three times larger than that of the local taxi market, in excess of $500 million per year.  The revenue generated through Uber's activities substantially contributes to the financial requirements of the Uber's operations.

**WEINSTEIN CAGGIANO PLLC**
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

5.72 Uber requires drivers to accept all ride requests when logged into its App or else face potential discipline. Uber expects its drivers to comply with all relevant state, federal and local laws governing the transportation of riders with disabilities, including transporting service animals. Uber specially instructs its drivers on accessibility for riders with disabilities.

5.73 The general public recognizes Uber as a common carrier. The phrase "Ubering" has become a term-of-art meaning summoning an Uber vehicle to get from point A to B.[1]

### E.      Uber Exercises Significant Control Over its Drivers

5.74 Uber drivers are required to follow numerous detailed requirements imposed on them by Uber. Uber drivers are graded, and are subject to termination, based on their failure to adhere to these requirements. These include rules regarding their conduct with customers, the cleanliness of their vehicles, their timeliness in picking up customers and taking them to their destination, and what they are allowed to say to customers.

5.75 Uber's fare prices for rides are set exclusively by Uber. Drivers have no input on who they are picking up or the fares charged to customers. Drivers are not permitted to choose customers or negotiate with customers on fares charged. Uber retains the right and the ability to adjust charges to riders if Uber determines that a driver took a circuitous route to a destination.

5.76 Uber processes the fare for each ride and then pays a fixed portion of the fare to the drivers directly. Uber drivers are not allowed to accept tips.

5.77 Uber provides auto insurance for drivers that do not maintain sufficient insurance on their own. Insurance provided by Uber covers incidents occurring while a driver is connected online with the Uber App, with coverage increasing when a rider is in the vehicle.

---

[1] Multiple courts and state regulatory agencies have recognized Uber's status as a common carrier, even though Uber has attempted to disclaim itself as such.  The U.S. District Court for the Northern District of California held that Uber is a common carrier. *See Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 786 (N.D. Cal. 2016) ("Plaintiffs' allegations support the claim that Uber 'offers to the public to carry persons,' thereby bringing it within California's definition of common carrier for tort purposes.").   In April of 2018, The California Public Utilities Commission found that Uber was both a transportation network company and a charter party carrier.  Similarly, in 2014, the City of Seattle passed an ordinance regulating transportation network drivers as it would other common carriers.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

5.78 Uber controls its drivers' contacts with its customer base and considers its customer list to be proprietary information.

5.79 Uber attempts to impose uniformity in the conduct of its drivers. Uber policy mandates that all drivers:

a.      Dress professionally;

b.      Send the customers requesting rides a test message when the driver is 1-2 minutes away from the pickup location;

c.      Keep the radio either off or on "soft jazz or NPR;"

d.      Open the door for riders;

e.      Pick up customers on the correct side of the street where the customer is standing;

f.      In some cities, Uber requires drivers to display an Uber sign in the windshield;

g.      Uber encourages drivers to offer breath mints and water to riders;

h.      Uber retains a fee of approximately 20-30% of every ride charged to a customer.

5.80 In some locations, Uber rewards active drivers that maintain a high acceptance rate for ride requests, total number of hours online, total number of completed trips, and customer rating by providing a "gross fare guarantee" that sets a specific hourly pay that drivers receive, tantamount to a wage.

5.81 Uber at times also incentivizes drivers to continue driving by paying a minimum rate of $10–26 to log into the App, accept 90% of ride requests, complete one trip per hour, and be online 50 out of 60 minutes. The result of such incentive programs is that drivers are guaranteed a minimum amount of pay from Uber regardless of actual work performed, tantamount to a salary.

5.82 Uber can deactivate its drivers and make the Uber App inaccessible with the push of a button. For example, Uber retains the right to terminate drivers at will, with or without cause,

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

and relies in part on rider feedback to discipline or terminate drivers. Once deactivated, drivers cannot be paired with riders seeking rides through the Uber App.

5.83 Uber processes and deals with customer complaints regarding drivers and maintains a driver rating system a rating system used by customers whereby riders rate their Uber drivers on a scale from 1–5.

5.84 In 2014, Uber sent a guide to all of its drivers explaining how the driver-rating system works, and how drivers can improve their scores. The document explains that drivers with an average score of 4.6 or lower are at risk of being deactivated if they do not make improvements. The document says that only 2–3% of drivers are in the danger zone below a 4.6 average rating and that "deactivating the accounts of the drivers who provide consistently poor experiences ensures that Uber continues to be known for quality."

5.85 Uber drivers are sent an email newsletter every week by Uber which covers fares, surge pricing, and other relevant information. If a rider is underperforming, the communication includes a line of red text to let them know that their average rating is low:

## 4.68★

### DRIVER RATING

Unfortunately, your driver rating last week was
**below average.**

Uber also created a diagram intended to remind drivers to keep their rating high:



5.86 Uber maintains "deactivation guidelines" that grant Uber the right to deactivate a driver's account or place it on "hold" while Uber conducts an investigation if it receives complaints of prohibited conduct. For example, Uber's website states that "Actions that threaten the safety of drivers and riders will be investigated and, if confirmed, lead to permanent

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

deactivation of your account . . . Depending on the nature of the concern, we may put a hold on your account during our investigation. If the issues raised are serious or a repeat offense, or you refuse to cooperate, you may lose access to Uber. Any behavior involving violence, sexual misconduct, harassment, discrimination, or illegal activity while using Uber can result in the immediate loss of your account. Uber will also deactivate the account of any driver who receives several or serious complaints of poor, unsafe, or distracted driving while using the Uber app."[2]

5.87 Uber also tracks a statistic known as "acceptance rate." When a rider requests a trip through Uber, the nearest driver gets a "ping" telling the driver that someone wants a ride. The driver then has 15 seconds to tap on the screen of their phone and accept the ping, otherwise it goes to another driver. The percentage of pings accepted is the acceptance rate. Uber tells drivers that they should keep above an 80% acceptance rate, but "the closer to 100% the better." Drivers who reject too many ride requests risk face discipline, including temporary deactivation or termination.

5.88 Uber also has specific regulations about where its drivers can pick up riders. Uber does not permit drivers to drive outside their home city, even temporarily. In some instances, if a driver attempts to use the Uber App in an unauthorized location, the App will inform the driver that "your account is not authorized in this market" and prohibit the driver from picking up customers.[3]

---

[2] https://www.uber.com/legal/community-guidelines/us-en/.
[3] Although Uber classifies its drivers as independent contractors, multiple courts have held that Uber's significant exercise of control over its drivers plausibly creates an employer/employee relationship. *See*, *e.g.*, *Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 782 (N.D. Cal. 2016) ("plaintiffs have alleged sufficient facts to claim plausibly that an employment relationship exists"); *Razak v. Uber Techs., Inc*., No. CV 16-573, 2016 WL 5874822, at *4 (E.D. Pa. Oct. 7, 2016) (holding held that plaintiffs sufficiently alleged that they are properly classified as employees under the Fair Labor Standards Act and Pennsylvania state law); *Search v. Uber Techs., Inc.*, 128 F. Supp. 3d 222, 233 (D.D.C. 2015) ("a reasonable factfinder could conclude that Uber exercised control over [plaintiff] in a manner evincing an employer-employee relationship"); *O'Connor v. Uber Techs., Inc*., 2013 WL 6354534, at *6 (N.D. Cal. Dec. 5, 2013) ("the Complaint contains sufficient allegations about control to make the existence of an employment relationship plausible on its face."); *cf.*, *Cotter v. Lyft, Inc*., 60 F. Supp. 3d 1067, 1078 (N.D. Cal. 2015) (making same finding in context of Uber's primary competitor Lyft).

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

**F. Uber Aggressively Markets its Safety to Increase its Customer Base and Ridership**

5.89 Uber's business model is contingent on convincing its customers it is safe to get into a stranger's vehicle. To do this, Uber makes a number of representations on its webpages, in communications with customers, and in the media designed to create the impression that Uber provides what Uber characterizes as the "safest rides on the road."

5.90 In or about April 2014, after a wave of bad press concerning the credentials of Uber drivers, Uber created a specific webpage dedicated to touting the "safety" of riding with Uber (the "Safety" webpage).[4]  Uber's website prominently displayed the slogan "SAFEST RIDES ON THE ROAD – Going the Distance to Put People First"—with a picture of a young girl riding in the front seat with an Uber driver:



The paragraph below the depiction provides that:

Wherever you are around the world, Uber is committed to connecting you to the **safest ride on the road**. That means setting the **strictest standards possible**, and

---

[4] Uber continues to use the URL: www.uber.com/safety.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

then working hard to improve them every day. The specifics vary depending what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security – what we are doing in the US is an example of our standards around the world.

5.91  Uber represented on the same webpage under the tagline "RIDER SAFETY" that "Every ridesharing and livery driver is thoroughly screened through a rigorous process we've



### RIDER SAFETY

From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind.

**BACKGROUND CHECKS YOU CAN TRUST**

Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using industry-leading standards. This includes a three-step criminal background screening for the U.S. — with county, federal and multi-state checks that go back as far as the law allows — and ongoing reviews of drivers' motor vehicle records throughout their time on Uber.

READ MORE

| BACKGROUND CHECKS | NO HAILING | ANONYMOUS FEEDBACK | DRIVER PROFILES |

developed using industry-leading standards. This includes a three-step criminal background screening for the U.S.—with country, federal and multi-state checks that go back as far as the law allows—and ongoing reviews of drivers' motor vehicle records throughout their time on Uber."

5.92  The "read more" link on the "BACKGROUND CHECKS YOU CAN TRUST" segment of Uber's "Safety" webpage connected readers to an entry dated April 25, 2014 on the Uber blog.[5]  In the blog, Lane Kasselman, the former head of communications for Uber, made a

---

[5] Formerly available at http://blog.uber.com/driverscreening.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  ·  FACSIMILE (206) 237-8650

number of representations touting the "rigorous" background checks Uber conducts compared to other transportation methods:

> **All Uber ridesharing and livery partners must go through a rigorous background check. The three-step screening we've developed across the United States, which includes county, federal and multi-state checks, has set a new standard. These checks go back 7 years, the maximum allowable by the Fair Credit Reporting Act.**
>
> We apply this comprehensive and new industry standard consistently across all Uber products, including UberX. Screening for safe drivers is just the beginning of our safety efforts. Our process includes prospective and regular checks of drivers' motor vehicle records to ensure ongoing safe driving. **Unlike the taxi industry, our background checking process and standards are consistent across the United States and often more rigorous than what is required to become a taxi driver.** (Emphasis added)

Kasselman's blog entry ended: "The bottom line: Uber works hard to ensure that we are connecting riders with the safest rides on the road. The current efforts we are undertaking to protect riders, drivers and cities are just the beginning. We'll continue innovating, refining, and working diligently to ensure we're doing everything we can to make Uber the safest experience on the road."

5.93 In June 2014, Lane Kasselman was quoted in the media stating: "We're confident that every ride on the Uber platform is safer than a taxi."[6]   Uber has also represented that its background checks "exceed any local or national standard."

5.94 In late 2014, the district attorneys for San Francisco and Los Angeles, California filed a lawsuit against Uber for its misleading statements regarding the safety of its services, including claims that Uber was "setting the strictest safety standards possible" with background checks that used "industry-leading standards." The complaint provided 25 specific examples of individuals approved to drive for Uber who had previously been ***convicted*** of major felonies, including: second degree murder, lewd and lascivious acts against a child under the age of 14, sexual exploitation of children, kidnapping for ransom with a firearm, assault with a firearm, grand theft

---

[6] http://www.nbcbayarea.com/investigations/SF-DA-Wants-Stricter-Rules-for-Rideshare- Companies-261754071.html.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  ·  FACSIMILE (206) 237-8650

robbery, identity theft, burglary, and taking a vehicle without consent, which Uber failed to uncover. They were discovered to be driving for Uber only after being cited for an illegal airport ride or street hail.

5.95 At the time the suit was filed, Los Angeles district attorney Jackie Lacey said that Uber "put consumers at risk by misleading the public about the background checks of its drivers." San Francisco district attorney George Gascon called Uber's background checks without fingerprinting "completely worthless."[7]

5.96 Following these revelations, Uber removed the Kasselman blog from its website and replaced it with a new blog entry written by Joe Sullivan, Uber's new "Chief Security Officer" in the portion of the Uber website dubbed the "Newsroom."

5.97 Sullivan's blog entry dated July 2, 2015 ("the Sullivan blog"), stated that Uber's background check process consists of running an applicant's name and address through databases identified as "the National Sex Offender Registry, National Criminal Search, and several different databases used to flag suspected terrorists." The blog goes on to explain that if the database search identifies a criminal record, then Uber's background check provider will send someone to the relevant local courthouse to gather the records. Gathering records at the courthouse, Sullivan claims, "helps ensure the records match the identity of the potential driver."

5.98 The Sullivan blog added "driver disqualification" criteria that were missing from Uber's earlier representations, including convictions for fraud, theft-related offenses, and any other felony conviction. Uber also began promoting its "Incident Response Team" team and "zero tolerance" policies for dangerous behavior, including that: "In the event of dangerous behavior by a rider or driver-partner, Uber's response team can deactivate that person's account, immediately preventing him or her from accessing the platform again. This removes incentive for bad behavior and prevents it from being repeated on the platform."

---

[7] In April 2016, Uber agreed to pay $10 million to settle the case, along with a guarantee of an additional $15 million if Uber failed to comply with the terms of the settlement. As part of the settlement, Uber agreed that it would no longer advertise using phrases such as "safest ride on the road" and describing its background checks as "the gold standard."

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

**G.     The Safe Rides Fee**

5.99 In April 2014, Uber continued to reinforce its safety message with the implementation of "Safe Rides Fee" added to every UberX fare in order to support Uber's "efforts to always connect [riders] to the safest rides on the road." The fee was originally $1.00, and later varied by city, sometimes exceeding $2.00.



5.100 A question mark next to the words "Safe Rides Fee" contained a hyperlink that provided a more in-depth explanation of the "Safe Rides Fee." It stated that the fee is used to support, among other things, "continued efforts to ensure the safest possible platform for Uber riders" including "an industry-leading background check process."

## What Is The Safe Rides Fee?

From the beginning, we've always been committed to connecting you with the safest rides on the road. The Safe Rides Fee is a small fee added to uberX fares on behalf of drivers in cities with uberX ridesharing. This Safe Rides Fee supports continued efforts to ensure the safest possible platform for Uber riders and drivers, including a Federal, state, and local background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and more. For complete pricing transparency, you'll see this as a separate line item on every uberX receipt.

In the U.S., the Safe Rides Fee is always $1 USD. In Canada, it is $1 CAD.

5.101 In just two years, Uber generated nearly $450 million from its implementation of the "Safe Rides Fee."

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

**H.      Uber's Safety Marketing Targets Late-Night Riders**

5.102 As part of marketing itself as a safer alternative to other forms of transportation, Uber specifically targets females and intoxicated late night riders. Uber claims its "rush hour starts just after last call at bars."[8]

5.103 In 2015, Uber released a report with Mothers Against Drunk Driving ("MADD"). The report states: "The Uber app was ***created to ensure reliable access to safe rides*** whenever, wherever. . . . Uber is more than just a convenient transportation option. The choice, reliability and flexibility [Uber] affords also make Uber a powerful tool in the quest to protect families from drunk driving." The report goes on to state that with Uber, intoxicated persons can find "**a safe, reliable ride home**" that is "always within reach." (Emphasis added).

5.104 Uber has also advertised that it allows for "safe pickups" and "no more waiting alone on a dark street hoping you can hail a taxi."

5.105 By marketing directly to those who have been drinking, Uber is consistently reinforcing its message that summoning an Uber will result in "a safe, reliable ride home."

**I.      Uber Does Not Conduct "Industry Leading" Background Checks**

5.106 Uber does not, and has never, provided customers with an "industry-leading" background check process. Instead, Uber has adopted a quick, name-based background check, and has continuously stonewalled, refused and lobbied against adopting industry-standard, fingerprint-based background checks from its driver qualification process.

5.107 Uber's background check process relies upon drivers to submit personal identifiers (name, address, driver's license number and state, and social security number) through an online webpage. Uber, in turn, provides this information to third party vendors, such as Checkr, Inc., to perform a basic, name-based background check.

---

[8] https://www.uber.com/helping-cities/.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

5.108 Neither Uber nor the third-party vendors it uses for background checks verifies that the information provided by applicants is accurate or complete. The turnaround time for an Uber background check is typically between 3-5 days.

5.109 The difference between name-based background checks and fingerprint-based background checks is significant. While a name-based background check searches the applicant's reported name against various databases and compares records that have the same name, a fingerprint-based background check (or biometric check) uses the fingerprints of the individual to match against a law enforcement database, comparing records that have the same print, even if the names are different.

5.110 For example, most prospective taxi drivers are required to undergo criminal background checks that require the driver to submit fingerprints through a technology called "Live Scan." The fingerprint images are used to automatically search against all other fingerprint images in government criminal record databases, including databases maintained by state law enforcement and the Federal Bureau of Investigation (FBI). The FBI's database includes criminal record information from all 50 states, including sex offender registries. If a person has a criminal history anywhere in the U.S., it will register as a match.

5.111 Fingerprints are not only a highly accurate way to confirm an individual's identity, they are also universally used among state and federal government agencies.  This allows for the highest levels of information-sharing among all relevant agencies—an element that is lacking when fingerprints are not used to verify identities.

5.112 Fingerprint background checks through local, state, and federal criminal files are the gold standard for public and private employers who wish to determine if a prospective employee or contractor has engaged in disqualifying criminal activity. A wide range of job applicants are required by local public safety statutes to undergo fingerprint background checks, including taxi drivers, airport workers, teachers, real estate professionals, mortgage brokers, security guards, day care workers, home health aides, nurses, government employees, and even most school volunteers.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

5.113 Because of the unique identifying characteristics of fingerprints, the Live Scan process provides assurance that the person whose criminal history has been run is, in fact, the applicant. This would ensure that a convicted murderer could not use a false identification to become an Uber driver.

5.114 Name-based background checks, on the other hand, are limited and not easily shared among the appropriate authorities. These criminal background checks are performed on publicly-available databases and records from county courthouses, which are not linked to each other and typically do not go back past seven years. Because the FBI database is not accessed, there is no true national search performed, making these searches incomplete, limited and inaccurate.

5.115 Name-based background checks present systematic, fundamental problems. First, there is no way to positively identify a person via a biometric indicator, increasing the likelihood of fraud. Uber itself recognizes the vulnerability of name-based checks, noting on its website that: "Of course, the background check system that Uber [uses] is not 100% accurate either . . . For example, a potential driver may have a stolen or fraudulent identity, an illegally obtained but valid social security number that conceals his or her true identity, or he or she may have been convicted of a crime outside the background lookback limits permitted by state law."

5.116 Likewise, because names, addresses and birthdays are not unique, the likelihood of false positives (a person linked in error with another's record) and false negatives (someone getting cleared when they should not) are greatly increased. For example, if an individual changes their name, or for some other reason has a criminal history under a different name, such as a maiden name, the name-based checks can miss the individual's criminal history.

5.117 Uber's other "safety" measures also fall well short of established industry standards. For example, Uber does not conduct in-person interviews with prospective drivers, require references, require any training, or even verify the actual identity of the driver. Likewise, instead of performing actual inspections of drivers' vehicles, Uber allows prospective drivers to simply send photographs of their vehicles and the inspection form to the company.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

5.118 Despite consistently marketing its driver background check process as "industry-leading" and "more rigorous than what is required to become a taxi driver"—in reality Uber's application process is designed for speed, not safety. At no time during the application process does Uber or its third-party background check vendor, acting on Uber's behalf, do any of the following:

  a.  Conduct Live Scan biometric fingerprint background checks of applicants;

  b.  Conduct in-person interview of applicants;

  c.  Require references from third parties;

  d.  Verify vehicle ownership;

  e.  Conduct physical vehicle inspections;

  f.  Verify that social security numbers and other personal identification numbers submitted in the application process in fact belong to the applicants;

  g.  Require applicants to attend training classes on driving skills;

  h.  Require applicants to attend training classes to prevent, harassment, including sexual harassment of customers;

  i.  Require applicants to attend training classes to hone skills needed to safety use mobile applications while driving;

  j.  Require applicants to pass written examinations beyond basic "city knowledge" tests;

  k.  Require applicants to pass road vehicle tests; or

  l.  Require applicants to pass vision and hearing exams.

5.119 Moreover, Uber limits its background check to criminal convictions going back seven years. On Uber's "Safety" webpage and in subsequent blog posts, Uber has misrepresented that seven years is the "maximum" amount of time Uber is permitted to look back under state and federal law. This is not the case.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

5.120 Federal law allows criminal convictions to be reported indefinitely. The Fair Credit Reporting Act (FCRA), cited by Uber, does not have time limitations on reporting criminal convictions for hiring purposes. Indeed, the FCRA bars reporting agencies from reporting "[a]ny other adverse item of information, **other than records of convictions of crimes** which antedates the report by more than seven years." 15 U.S.C. § 168lc(a)(5). This means Uber can access convictions in a background check report regardless of the age of the conviction.

5.121 Additionally, Uber actively hides and misrepresents the applicability of the FCRA as the FCRA provisions apply only to those companies who choose to use a third party to conduct background checks.

5.122 Uber has made a conscious decision to use the FCRA as some sort of shield when it comes to conducting thorough background checks as they easily have the resources to establish an entire division of Uber devoted exclusively to conducting background checks.

5.123 The fact that Uber has not done so and has chosen to outsource what it represents to be one of its most important company values speaks volumes as to their actual commitment to passenger safety.

**J.      Uber Has Spent Millions Fighting Against Enhanced Safety Measures**

5.124 Uber has spent millions of dollars opposing city and municipality initiatives that would require Uber to adopt enhanced safety measures like fingerprint-based background checks.

5.125 The New York Times reported in a 2014 article that "Uber champions its 'industry-leading standards' for vetting its drivers. On its website, it describes its background checks as 'often more rigorous' than those in the traditional taxi industry. But in statehouses across the country, Uber has fought against legislation requiring background checks as strong as those demanded of traditional taxis."[9]

---

[9] https://www.nytimes.com/2014/12/10/technology/ubers-system-for-screening-drivers-comes-under-scrutiny.html?_r=0.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  ·  FACSIMILE (206) 237-8650

5.126 The article continued: "In Colorado, Uber helped persuade lawmakers to ease drivers' background checks in a bill that legalized ride-sharing companies. In Illinois, after a lobbying push, Gov. Pat Quinn vetoed a bill that would have forced Uber to strengthen those checks. And in California, Uber and other companies like it helped kill a law that would have required drivers to undergo a background check by the state's Justice Department, as is required of taxi drivers."[10]

5.127 Over the past year alone, state and local governments in Austin, Boston, Chicago, San Antonio, Connecticut, New York, and Rhode Island have debated the issue of requiring prospective Uber to require a fingerprint-based criminal background check. Uber has aggressively fought against these efforts at every turn.

5.128 For example, in Austin, Texas, the city council insisted that "ridesharing" companies such as Uber must comply with existing law requiring taxi drivers to be fingerprinted as part of a criminal background check. In May 2016, the City held a referendum vote on "Proposition 1", which would have exempted ride-sharing companies from the law and allowed Uber to continue using its own background check systems. In the weeks before the election, Uber (along with its primary competitor Lyft) spent nearly $9 million bombarding voters with mailers, ads, phone calls and text messages to support Proposition 1. When Uber lost the referendum 56% to 44%, it made good on its threat to stop offering rides in Austin and left the market.

5.129 Uber has also abandoned service in Galveston and Corpus Christi, Texas, and has threatened to leave Maryland, Miami, Houston, and other service areas if full background checks are mandated. In 2016, Uber tripled its lobbying efforts, spending millions of dollars fighting regulation on local, state and national levels.

5.130 Uber's opposition to fingerprint-based background checks has nothing to do with rider safety. Quite the opposite, Uber has acknowledged that requiring fingerprint-based background checks is inconsistent with its business objectives because it would impose additional

---

[10] *Id.*

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

time and cost to the driver application process and deter potential drivers from applying. This, of course, would come at the expense of Uber's ability to retain a large pool of on-demand drivers.

5.131 Uber has placed profits over safety by deliberately lowering the bar for drivers in order to rapidly expand its network of drivers and thus its profits. This is a calculated decision by senior executives to allow Uber to dominate the emerging rideshare market at the expense of public safety.

## K.   Uber's Safety Representations are False and Misleading

5.132 Uber's safety representations outlined above are false and misleading. Although in the wake of multiple lawsuits Uber has backed away from certain, specific safety misrepresentations,[11] Uber's safety narrative as a whole continues create the false impression Uber drivers have been rigorously vetted before a rider gets in the car.

5.133 Since the debut of Uber's "Safety" webpage in April of 2014, Uber has consistently reaffirmed its message that it does everything it can to ensure customer safety by implementing industry-leading background checks and disqualifying drivers that pose a threat to public safety. These misrepresentations, made on Uber's website and disseminated by representatives of Uber in the media, include, but are not limited to, Uber's representations that:

    a.    "All Uber [drivers] must go through a rigorous background check that leads the industry;"

    b.    The Safe Rides Fee supports an "industry-leading background check process;"

---

[11] For example, in September of 2014, after California district attorneys notified Uber that representing its background check process as "industry-leading" is false and misleading, Uber changed the words "industry-leading" under the heading "BACKGROUND CHECKS YOU CAN TRUST" to "constantly improving." In October of 2014, Uber changed the description of the background check hyperlinked to the "Safe Rides Fee" on every UberX receipt by replacing the words "industry-leading" with "Federal, state, and local." Sometime in December 2014, Uber dropped the claim that its background check "leads the industry" from the first sentence of the Kasselman blog. Three months later, on or about March 26, 2015, Uber eliminated its claim to be the "Safest Ride on the Road" and modified the banner over the picture of the little girl on its Safety Page to read, "Safety By Design," and then "Safe Rides Safer Cities – Putting People First." In late 2016, Uber renamed its "Safe Rides Fee" to a "Booking Fee."

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON 98101
(206) 508-7070 · FACSIMILE (206) 237-8650

c.   Uber has "Background Checks that Exceed any Local or National Standard;"

d.   Uber's background check process is "often more rigorous than what is required to become a taxi driver;"

e.   Uber's safety measures "always exceed what is required of local taxi companies;"

f.   Uber's background checks "go back as far as the law allows;"

g.   Uber's background checks go back "the maximum allowable by the Fair Credit Reporting Act;"

h.   "The Uber app was created to ensure reliable access to safe rides whenever, wherever;" and

i.   Intoxicated individuals "can tap a button to request a safe, reliable ride home" and that with Uber, "a safe, reliable ride home is always within reach."

5.134 Multiple courts have recognized that these and similar representations are more than mere "puffery"—they constitute literally false statements and statements that are likely to mislead or confuse consumers.[12]  As stated by the district attorney of San Francisco: "You are not using an 'industry-leading' background check process if you are not fingerprinting your drivers."

**L.   Uber Drivers Have Committed Numerous Assaults Against Riders**

5.135  Concerns about the threats Uber drivers pose to their riders are not merely hypothetical. As a result of Uber's deficient and lax application process, individuals who have been convicted of felonies and violent crimes have successfully registered as Uber drivers time

---

[12] *See, e.g.*, *Delux Cab, LLC v. Uber Techs., Inc.*, No. 16CV3057-CAB-JMA, 2017 WL 1354791, at *4 (S.D. Cal. Apr. 13, 2017) (Uber's safety representations likely "to induce consumer reliance"); *Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 789 (N.D. Cal. 2016) (upholding fraudulent misrepresentation claim where Uber riders alleged that transportation service made false statements that customers would be safe taking rides while knowing that it did not adequately screen its drivers, that it misrepresented its ability to track its drivers, and customers described in detail the process by which the service screened its applicants for drivers); *L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 861 (N.D. Cal. 2015) ("A reasonable consumer reading these statements in the context of Uber's advertising campaign could conclude that an Uber ride is objectively and measurably safer than a ride provided by a taxi or other competitor service").

COMPLAINT - 28

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON 98101
(206) 508-7070 · FACSIMILE (206) 237-8650

and again, exposing riders to dangerous and potentially violent situations without their knowledge or consent.

5.136 In the year prior to this incident, hundreds of crimes were reported by individuals against their Uber drivers, ranging from driving drunk to theft, sexual assault, kidnapping, and rape.

5.137 Who's Driving You?, a public safety initiative of the Taxicab, Limousine & Paratransit Association, tracks news articles across the country discussing serious incidents involving Uber drivers, including Uber drivers causing deaths, committing assaults, sexual assaults, and involvement in other serious incidents.[13]

5.138 In just the year prior to this incident, Uber drivers had been accused of a shocking number of serious sexual offenses involving their passengers. A small sampling of the chilling headlines read as follows:

    a.    Uber driver accused of kidnapping, sexually assaulting intoxicated female passenger (6/26/17);[14]

    b.    Los Angeles, California customer sues after Uber driver allegedly stuck hand up her dress (6/22/17);[15]

    c.    Allentown, Pennsylvania Uber driver offered minor money and rides for sex, cops say (6/21/17);[16]

    d.    Uber driver allegedly sexually assaults woman in Detroit, Michigan (6/13/17);[17]

    e.    Uber driver arrested in sexual battery of passenger in Moraga, California (6/6/17);[18]

---

[13] http://www.whosdrivingyou.org/rideshare-incidents.
[14] http://www.latimes.com/local/lanow/la-me-ln-sex-crime-uber-20170626-story.amp.html.
[15] http://www.dailynews.com/general-news/20170622/uber-customer-says-la-driver-shot-his-hand-up-her-loose-dress-and-shes-suing.
[16] http://www.lehighvalleylive.com/bethlehem/index.ssf/2017/06/man_who_texted_minor_for_sex_f.html.
[17] http://www.fox2detroit.com/news/local-news/260704029-story.
[18] http://www.sfgate.com/crime/article/Uber-driver-arrested-in-sexual-battery-of-11200757.php#item-39786.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

f.      Police identify Uber driver wanted in connection with sexual assault of university student in Riverside, California (5/24/17);[19]

g.      Florida Uber driver arrested after sexually assaulting 14-year-old passenger: Police (5/12/17);[20]

h.      Palm Beach County, Florida Uber driver accused of kidnapping, sexual battery and burglary (5/9/17);[21]

i.      University of Kentucky Police Department: student reports sexual abuse on campus by Uber driver (4/27/17);[22]

j.      Uber driver in Orange County, California charged with raping his passenger (4/26/17);[23]

k.      Newton, Massachusetts Uber driver accused of sexually assaulting female passenger (4/25/17);[24]

l.      Uber driver accused of sexually assaulting passenger in Akron, Ohio turns himself in (4/12/17);[25]

m.      Uber driver suspended, investigated for making advances on women in Greenville, North Carolina (3/15/17);[26]

n.      Minnesota woman: after I rebuffed my Uber driver's advances, he tried to rape me (2/25/17);[27]

o.      Uber driver charged with raping passenger in Virginia Beach (3/7/17);[28]

---

[19] http://ktla.com/2017/05/24/uber-driver-wanted-in-connection-with-sexual-assault-of-university-student-in-riverside/.
[20] http://www.nbcmiami.com/news/local/florida-uber-driver-sex-assault-teen-422121384.html.
[21] https://www.local10.com/news/crime/uber-driver-accused-of-raping-woman-after-taking-her-home-from-sunfest.
[22] http://www.wtvq.com/2017/04/27/ukpd-student-reports-sexual-abuse-campus-uber-driver/.
[23] http://www.latimes.com/local/lanow/la-me-ln-uber-oc-charged-20170426-story.html.
[24] http://boston.cbslocal.com/2017/04/25/uber-driver-accused-sexually-assaulting-female-passenger-boston-college/.
[25] http://www.cleveland.com/akron/index.ssf/2017/04/akron_police_looking_for_uber.html.
[26] http://pilotonline.com/news/local/crime/uber-driver-charged-with-raping-passenger-in-virginia-beach/article_1e5017ff-ce21-5ea6-b725-c38bd3c1c2bf.html.
[27] https://arstechnica.com/tech-policy/2017/02/woman-sues-uber-claims-driver-with-prior-record-attempted-to-rape-her/.
[28] http://pilotonline.com/news/local/crime/uber-driver-charged-with-raping-passenger-in-virginia-beach/article_1e5017ff-ce21-5ea6-b725-c38bd3c1c2bf.html.

COMPLAINT - 30

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

p.      Toronto Police make arrest in alleged sexual assault of woman by Uber driver (2/14/17);[29]

q.      San Antonio, Texas Uber Driver accused of raping 22-year-old woman (1/16/17);[30]

r.      Former Uber Driver charged with sexually assaulting passenger in Houston, Texas (12/9/16);[31]

s.      Sacramento, California Uber driver under investigation after woman's 'creepy' ride (11/24/16);[32]

t.      Woman claims Uber driver sexually assaulted her, Ross, Pennsylvania police investigating (11/23/16);[33]

u.      Ohio woman says Uber driver sexually assaulted her inside her home: Mayfield Heights police blotter (11/9/16);[34]

v.      Uber driver charged with sexually assaulting teenage girl in Laguna Beach, California (11/8/16);[35]

w.      Uber just settled a huge sexual-assault lawsuit in California (11/4/16);[36]

x.      Palo Alto, California police arrest Uber driver on suspicion of sexual battery, stalking (11/1/16);[37]

y.      Uber driver accused of raping passenger in Miami-Dade County, Florida (10/20/16).[38]

---

[29] http://www.cp24.com/news/police-make-arrest-in-alleged-sexual-assault-of-woman-by-uber-driver-1.3284458.
[30] http://www.kens5.com/news/sa-uber-driver-accused-of-raping-22-year-old-woman/386607930.
[31] http://www.chron.com/news/houston-texas/houston/article/Former-Uber-driver-charged-with-sexually-10785443.php.
[32] http://fox40.com/2016/11/24/uber-driver-under-investigation-after-womans-creepy-ride/.
[33] http://www.wtae.com/article/woman-reports-being-sexually-assaulted-in-an-uber-to-shaler-police/8355709.
[34] http://www.cleveland.com/hillcrest/index.ssf/2016/11/woman_says_uber_driver_sexuall.html.
[35] http://www.ocregister.com/articles/uber-734716-mahran-beach.html.
[36] http://nymag.com/thecut/2016/11/uber-can-be-held-liable-for-its-drivers-sexual-misconduct.html.
[37] http://www.nbcbayarea.com/news/local/Palo-Alto-Police-Arrest-Uber-Driver-on-Suspicion-of-Sexual-Battery-Stalking-399557541.html
[38] https://www.local10.com/news/crime/uber-driver-accused-of-raping-passenger-in-miami-dade-county.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

5.139 Uber's primary defense to these crimes is that Uber had no reason to know the assailant driver posed a safety risk to riders because the driver's background check came back clean. For example, on February 20, 2016, an Uber driver in Kalamazoo, Michigan named Jason Dalton went on a shooting rampage, killing six people and wounding two others. After the incident, Uber's chief security officer Joe Sullivan defended Uber's background check process and emphasized that "no background check would have flagged and anticipated this situation" because Dalton had a clean criminal record.

5.140 Uber was also criticized after the Kalamazoo incident for permitting Dalton to continue picking up riders even after a rider complained of his "erratic driving" approximately four hours before the first victim was killed. An Uber spokesperson stated that because the complaint was not about violence, it was not prioritized by Uber's response team. Joe Sullivan held a conference call further clarifying that Uber will deactivate drivers "within minutes" when it receives a report of driver violence, but if the report involves driver performance, Uber will first get in touch with the driver to get "both sides of the story" before the driver is deactivated.

**M.** **Uber's Public Safety Representations Are Inconsistent with its Corporate Behavior**

5.141 In March 2016, BuzzFeed News published an article entitled "Contracts And Chaos: Inside Uber's Customer Service Struggles" that provided an inside account of the turmoil surrounding Uber's customer support response team. Specifically, the article discussed Uber's decision to move a significant portion of its customer support team to overseas contractors in places like Manila where there were high quotas and language barriers that caused serious complaints and reports about Uber drivers to fall through the cracks.[39]

5.142 For example, one Uber customer support representative (referred to internally by Uber as a "CSR") reported that in September 2015, a female rider filed a late-night ticket complaining about her driver. The driver told the rider that if she performed a sexual act on him,

---

[39] https://www.buzzfeed.com/johanabhuiyan/contracts-and-chaos-inside-ubers-customer-service-struggles?utm_term=.hf67vV1Qw#.sedpj7yE9.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  ·  FACSIMILE (206) 237-8650

she wouldn't have to pay for the ride. The Manila agent just sent it up to regular escalation to level 2 instead of advanced because the sense of urgency was lost in translation. According to the CSR, "the ticket in question should have escalated immediately, but instead it sat in the level 2 queue until a U.S. employee spotted it."[40]

5.143 The article also described how many CSRs questioned Uber's commitment to safety, and published screenshots of Uber's customer support logic matrix, which reveals escalation protocols explicitly tied to "media interest" and "real threat of media/LE (law enforcement) interest." For example, some protocols include language where a level 2 ticket for "driver stalking or inappropriate communications" is escalated to Uber's "Crisis Team" as a level 3 ticket *only if* media or law enforcement interest has been confirmed. The protocol also states, "If rider does not wish to escalate, follow strike system, issue warning, and resolve without escalating."[41]

5.144 Other CSRs interviewed in the article noted a lack of guidance from Uber team leads who managed them. One CSR said she had five different managers in a single year and never had a meeting with any of them. According to the article, "this created an environment that wasn't just unpleasant for the people who worked in it, but that also sometimes left Uber's CSRs—the first line of defense and support for the company's customers worldwide—unequipped to handle emergency support requests."[42]

5.145 BuzzFeed News followed up with a second article in March 2016 entitled "Internal Data Offers Glimpse at Uber Sex Assault Complaints" that included screenshots from Uber's internal database tracking driver complaints.[43] In one screenshot, a search query for "sexual assault" returned 6,160 Uber customer support tickets. A search for "rape" returned 5,827 individual tickets. Other variations of the terms yield similarly high returns: A search for "assaulted" showed 3,524 tickets, while "sexually assaulted" returned 382 results.

---

[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] https://www.buzzfeed.com/charliewarzel/internal-data-offers-glimpse-at-uber-sex-assault-complaints?utm_term=.rjx5MzqR6#.dwGqM4yEB.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

5.146  Uber conducted a review and concluded that the rape ticket counts were "significantly overstated" due to various forms of false positives. Uber representatives then penned an open letter to the BuzzFeed editors entitled "Safety at Uber." The letter stated in pertinent part:

> We have worked with your team over the last week to answer questions about safety at Uber, but the story you have just posted fails to take into account the many facts we have provided to Buzzfeed. Given that our business depends on accountability and transparency, we are now sharing that information publicly so that our riders and drivers have the facts and can judge for themselves.

> Getting people from point A to B safely and reliably is the single most important thing Uber does. It's why we have a dedicated Trust and Safety team, overseen by Joe Sullivan (whose entire career has been focused in this field, first as a federal prosecutor and then at eBay, Facebook, and now Uber) and run by Phil Cardenas (the former head of Trust and Safety at Airbnb).

> This team exists to reduce safety incidents, and its success is judged on that one metric. Because even one incident is too many. It's why Uber has invested heavily in technology to improve safety for everyone before, during, and after each ride. Every Uber trip is GPS-tracked, and passengers can share their route in real time with family or friends, as well as rate their drivers at the end of each trip (and vice versa). This is on top of a robust system of background checks.

> Sadly, no means of transportation is 100 percent safe today. Accidents and incidents do happen. It's why we are working to build an exceptional customer support team that can handle problems when they occur, including working with law enforcement.

> ***

> When serious incidents are reported to us, we always reach out to the person who filed the report and, where appropriate, engage with law enforcement. We also temporarily suspend the driver or rider (if it is a question of violence by a passenger) during the investigation.

> ***

> Uber is a relatively young company and we're the first to admit that we haven't always gotten things right. But we are working hard to ensure passengers everywhere can get a safe, reliable ride, as well as to provide great customer service when things go wrong. It's a shame that your article does not reflect much of the substance we have provided.

> Sincerely,

> Joe Sullivan, Chief Safety Officer
> Jill Hazelbaker, Vice President, Communications & Public Policy

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

Tim Collins, Vice President, Global Support[44]

5.147 But Uber's public representations regarding safety are demonstrably at odds with its internal corporate behavior. Many independent accounts have detailed how Uber's company culture promotes aggressive expansion and profits over safety, especially with respect to women. In February 2017, Susan Fowler, a former Uber engineer, wrote in a blog post that she was sexually harassed by her supervisor at Uber and that the human resources department ignored the claims. Thereafter, other employees came forward reporting systemic issues in the company, saying that a premium was placed on workers who delivered strong performance and aggressive growth, and that their behavioral transgressions were often overlooked. The New York Times reported that Uber's "focus on pushing for the best result has also fueled what current and former Uber employees describe as a Hobbesian environment at the company, in which workers are sometimes pitted against one another and where a blind eye is turned to infractions from top performers."[45]

## N.    Uber Still Does Not Get It

5.148 In 2018, Uber CEO Dara Khorshwhahi conducted an interview with the Seattle Times in which he noted that, "I can't change the past, but I can change the things that we do going forward."   (See Exhibit M, "*Uber to up its background checks for drivers*," published by Seattle Times, April 12, 2018.)

5.149 However, the reality is that while Uber has announced that it will do yearly background checks, it still does not perform background checks that go beyond seven years.  Nor, has it done anything to correct the fact that it presently has hundreds of violent felons driving for it that would not be allowed to drive for any other common carrier.

5.150 A simple $35 Livescan fingerprint background check **that could be paid for by the applicant** would eliminate a substantial portion of the violent felons, such as Sharif Soajima, who should not be entrusted with the public's care and safety.

---

[44] https://medium.com/uber-under-the-hood/safety-at-uber-6e638616bd4a (emphasis added).
[45] https://www.nytimes.com/2017/02/22/technology/uber-workplace-culture.html.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

5.151 That Uber continues to actively resist such a simple solution that would actually achieve their stated goal of connecting its passengers to "the safest ride on the road" should speak volumes about their actual commitment to customer safety.  The bottom line is having more drivers on the road is good for Uber; promoting customer safety is merely a talking point.

## VI.   FACTUAL BACKGROUND OF TORTIOUS ACTS AGAINST PLAINTIFFS

6.1 Plaintiff Brian Gorne downloaded and began using the Uber App in 2014.

6.2 Almost immediately, after downloading and beginning to use the App, Plaintiff Brian Gorne began to receive communications and emails from Defendant Uber regarding its safety. For example, in November of 2014, Plaintiff Brian Gorne received an email that stated:

> "Our top priority is connecting you with a safe and reliable ride, so whether you're out getting that holiday shopping done or heading out for a night on the town, Uber always has your back.

6.3 In addition, between the time period of 2014, and October of 2017, Plaintiff Brian Gorne used Uber's services on more than 150 occasions.  During that time, Plaintiff Brian Gorne incurred substantial charges related to Uber's "Safe Rider" fee in both California and other locations. Plaintiff believed that the "Safe Rider" fee was going to be used to perform comprehensive background checks on its drivers so that no convicted violent felons would be allowed to drive for Uber. See, for example, the following Uber receipt:

///

///

///

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

1

2

3

4

5

6

7

8

9

10

11

12

13

14



15    6.4 Plaintiff Brian Gorne also received and relied upon emails that were delivered to him

16  while in the State of California from Uber regarding its background checks.

17    6.5 Plaintiff Brian Gorne reasonably relied upon Defendant Uber's representations made

18  directly to him and made by Uber to the general public that Uber's top priority was safety, and

19  that Uber performed "industry leading" background checks on its drivers.

20    6.6 On the evening of October 1, 2017, Plaintiff Brian Gorne had gone to see a movie in

21  downtown Seattle.  After the movie ended, Mr. Gorne opened his Uber App, and hailed an Uber

22  looking for a "safe ride home."  Shortly after hailing his Uber, Mr. Gorne was approached by

23  Uber driver Sharif Soajima about completing his Uber fare home.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

6.7 After getting into Mr. Soajima's vehicle, Mr. Gorne and Mr. Soajima got into a verbal disagreement. As a result of this oral disagreement, Mr. Gorne decided that he no longer wanted to go with Mr. Soajima as his Uber driver and got out of the vehicle.

6.8 After getting out of the vehicle, Mr. Gorne proceeded to walk onto the sidewalk and was opening his phone to call for another Uber on his phone. As Plaintiff was doing this, Soajima proceeded to get out his vehicle and stab Mr. Gorne in the chest. Surveillance footage from a nearby closed-circuit camera captured Soajima's attack on our client.

6.9 The surveillance footage obtained by the Seattle Police Department shows Mr. Soajima's black Jeep Patriot pulling up and stopping near Plaintiff Brian Gorne at approximately 11:37 p.m. The footage then shows Mr. Gorne entering the Jeep, only to leave it approximately 15 seconds later and moving to stand back on the sidewalk. Soajima is then seen getting out of the vehicle, crossing over the front of the vehicle, and then moving toward Plaintiff Brian Gorne. Soajima is next seen making a sudden move toward Mr. Gorne, which causes him to jump backward. Soajima then takes a few steps back, and then once again moves toward Plaintiff Gorne in a menacing manner. At this time, Plaintiff Gorne is seen retreating even farther, and pulling up his shirt to reveal that he is bleeding. Soajima's next move is to flee the scene.

6.10 Plaintiff Brian Gorne was able to call 9-1-1 from the scene of the incident. Paramedics arrived shortly thereafter and found him sitting on the sidewalk, with a stab wound in his abdomen.

6.11 Soajima also called 9-1-1 shortly after the incident, and after he dropped his weapon in an unknown location. In his initial call to 9-1-1, Soajima claimed, falsely, that Plaintiff Gorne had been the aggressor and had attacked him. Soajima also claimed that he had only armed himself with an ordinary kitchen fork to defend himself.

6.12 However, the detective that investigated this incident, Alan G. Cruise, found Soajima's story of him defending himself with a fork, coupled with the surveillance video showing him as the clear aggressor, to be unpersuasive, and Soajima has now been charged with felony assault.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

**A.      Soajima is a Violent Felon with Eight Felony Convictions**

6.13 Sharif Soajima a/k/a Timothy Clark is 62-years-old.   While the precise date is presently unknown, Plaintiffs believe that Soajima began driving for Uber in early 2016.

6.14 Soajima's criminal record is as follows:

| Offense | Score | Disposition | Type* |
|---------|-------|-------------|-------|
| 84-1-03206-1   12-26-1984 assault 1st w/d weapon | | King Superior Court WA -  06-13-1985 240 m prison | AF |
| 84-1-03206-1   12-26-1984 robbery 1st w/d weapon | | King Superior Court WA -  06-13-1985 195m prison | AF |
| 84-1-03206-1   12-26-1984 robbery 1st w/d weapon | | King Superior Court WA -  06-13-1985 195m prison | AF |
| NO CASE #  07-18-1978 armed robbery | | Chicago IL -  03-16-1979 8 yrs | AF |
| NO CASE #  07-18-1978 armed violence | | Chicago IL -  03-16-1979 8 yrs cc | AF |
| NO CASE #  03-18-1973 burglary 2 | | Jefferson County MO -  12-06-1973 2 yrs | AF |
| NO CASE # robbery 1st | | Jefferson County MO -  12-06-1973 8 yrs | AF |
| NO CASE # attempt robbery 1st | | Jefferson County MO -  12-06-1973 8 yrs | AF |
| 7868758   10-24-1994 no valid op | | Southwest Div King Co Dist Ct WA - | AM |
| 7546658   07-25-1993 reckless driving | | Northeast District Court WA - | AM |

AF = Adult Felony; AM = Adult Misdemeanor

6.15 Soajima also had at least one restraining order filed against him.  In 2002, he was also charged with misdemeanor Assault in the 4th Degree, as well as Malicious Mischief in the third degree.

6.16 Soajima has been charged with the following crimes:

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

| Charges | |
|---|---|
| **Charge Information** | |
| Information - CRI - Criminal filed on 04/24/2018 | |
| Ct 1: Felony - 9A.36.021(1)(A) ASSAULT-2 SUBSTANTIAL BODILY HARM on 10/01/2017 - SOAJIMA (DEF 01) | |
| 1.1: Special Allegation - 9.94A.825 DEADLY WEAPON SPECIAL VERDICT DEF on 10/01/2017 - SOAJIMA (DEF 01) | |
| Ct 1.2: Felony - 9A.36.021(1)(C) ASSAULT-2 DEADLY WEAPON on 10/01/2017 - SOAJIMA (DEF 01) | |
| Ct 1.3: N - 9.94A.535(3)(Y) EXC SENTENCE-EXCEED LEVEL BODY HARM on 10/01/2017 - SOAJIMA (DEF 01) | |
| Ct 1.4: N - 9.94A.533(4) STANDARD SENTENCE ADD-DEADLY WPN on 10/01/2017 - SOAJIMA (DEF 01) | |

**B.    Brian Gorne's Injuries Were Horrific and Almost Fatal**

6.17 Plaintiff Brian Gorne was taken via ambulance from Pine Street to University of Washington Harborview Medical Center in Seattle.  At the Emergency Room, Plaintiff presented with a puncture wound to his left abdomen and had heavy internal bleeding.  When he entered the emergency room, Plaintiff's condition quickly deteriorated.

6.18 Given his worsening condition, Plaintiff Brian Gorne was immediately brought to the Operating Room for emergency exploratory surgery.  After having his abdomen opened up, and after several minutes of looking for the source of his internal bleeding, the physicians noted that there was active bleeding from the inferior pole of the spleen, and thus the decision was made to remove his spleen.

6.19 After removing Plaintiff's spleen, the doctors then turned their attention to repairing two separate "holes" in his stomach caused by the stab wound.  Given the location of the spleen, it's clear that Soajima's knife had been plunged so deep into the abdomen that it had perforated the stomach at two separate locations, i.e., an entrance and exit point, before it lacerated the spleen.  After repairing those internal injuries with stiches, Plaintiff Gorne's abdomen was then closed with 23 metallic staples.

6.20 In total, Plaintiff Gorne underwent more than 3 hours of this emergency exploratory surgery and it is estimated that he lost two (2) liters of blood, which is approximately 40% of the blood in his body.

**WEINSTEIN CAGGIANO PLLC**
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

6.21 On January 18, 2019, Mr. Gorne underwent a follow up hernia surgery related to his initial injuries.  Ultimately an abdominal mesh was used to repair approximately seven different hernias that he had sustained along the scar from the original exploratory surgery.

6.22 Plaintiff Gorne still has significant injuries and disfiguring scars as a result of this incident.

## VII.     FIRST CAUSE OF ACTION

### Negligence, Negligent Hiring, Negligent Supervision, and Negligent Retention

7.1 Plaintiffs reallege and reassert each of the preceding paragraphs as if fully set forth herein.

7.2 Uber owed Plaintiffs and the general public a duty of reasonable care in the hiring, training and supervision of its drivers.

7.3 In transporting members of the public, Uber operates in a critical position of public safety and has a duty to hire drivers that are skilled and competent to provide "safe, reliable rides."

7.4 As a common carrier Uber owed Plaintiff Gorne and the general public a duty of reasonable care in the hiring, training, and supervision of its drivers and is responsible for the negligent and tortious actions of its drivers.

7.5 Uber failed to exercise reasonable care in hiring Soajima.  At the time Soajima was hired as a driver for Uber, Uber knew or should have known that Soajima was dangerous as the result of his prior felony convictions.

7.6 Uber was either unaware of Soajima's prior violent felony convictions, or was made aware, and failed to take additional precautions such as conducting an in-person interview, reviewing third-party references, or performing a fingerprint background check on Soajima to determine whether he posed a risk to the safety of Uber riders prior to being hired. While Uber may have unilaterally decided that seven years is a sufficient criminal look-back period, the law imposes no such limit on Uber, a fact that Uber misrepresents to the public.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

7.7 Soajima was unskilled, unfit and incompetent to perform the work for which he was hired, to provide "safe, reliable rides." It was reasonably foreseeable to Uber that Soajima would expose riders to an unreasonable risk of harm.

7.8 Uber breached its duty of care in the hiring, retention and/or supervision of Soajima, who was unfit to be providers of transportation, and who was not adequately trained or supervised in their driving and conduct with customers. Uber knew or should have known that Soajima would be a danger to passengers and lead to a risk of the very type of danger and harm that occurred on October 1, 2017.

7.9 As a direct and proximate result of the negligence, carelessness, recklessness, and unlawfulness of Defendant, Plaintiffs sustained serious injuries.

7.10 Uber knew or should have known that its negligence and breach of duty of care would cause or had a substantial probability of causing severe emotional distress to Plaintiffs, and in fact did cause them severe emotional distress.

7.11 Defendant knew or reasonably should have known that Soajima was unfit and employed him with a conscious disregard of the rights or safety of others.

7.12 The conduct of Defendant Uber was also engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiffs herein.

7.13 Accordingly, Plaintiffs are entitled to recovery against Defendant Uber in an amount to be determined at trial.

### VIII. <u>SECOND CAUSE OF ACTION</u>

### <u>Fraud and Gross Negligence</u>

8.1 Plaintiffs re-allege and reassert each of the preceding paragraphs as if fully set forth herein.

8.2 Defendant made intentional misrepresentations of fact to Plaintiff Gorne known by Defendant to be false, to wit, that Plaintiff Gorne would be safely taking Uber rides with a driver whose background had been screened by Uber, and who would provide him with safe passage,

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

but who, in reality, Defendant had not screened in any meaningful way, and who was a grave threat to Plaintiff Gorne's safety and well-being.

8.3 Defendant made these misrepresentations to Plaintiff Gorne despite knowing that it had not adequately screened its drivers.

8.4 Uber's false statements concerning its safety measures detailed herein were made knowingly, or with willful, wanton and reckless disregard for the truth, and intended to deceive and defraud Plaintiff Gorne into agreeing to utilize Uber's services.

8.5 Defendant made these misrepresentations with the intent to cause Plaintiff Gorne to rely on this false information and induce him into utilizing Uber's services, in spite of the concerns Plaintiff had about his safety.

8.6 Plaintiff Gorne actually and reasonably relied on the false facts and misrepresentations provided by Defendant when he agreed to utilize Uber's services, after being told that Uber had screened Soajima, and that he would provide Plaintiff Gorne with safe passage.

8.7 Plaintiff Brian Gorne reasonably relied upon the fact that numerous "Safe Rider" fees had been collected from him and millions other similarly situated to him wherein the purpose was to provide background checks on drivers so that no violent felons were driving for Uber.

8.8 As a result of Defendant's deliberate misrepresentations of material facts, Plaintiff Gorne suffered significant damages.

8.9 Defendant Uber is liable for punitive and/or exemplary damages under choice of law principles. The fraudulent acts committed by Uber occurred in California. Washington has no interest in protecting persons who commit fraud. Because Washington has no interests superior to or inconsistent with the interests of California in this controversy, the Restatement rule dictates that California law should govern Plaintiffs' claim for fraud and punitive damages would apply.[46]

---

[46] *See Singh v. Edwards Lifesciences Corporation*, 151 Wn. App. 137, 144 (2009).

COMPLAINT - 43

**WEINSTEIN CAGGIANO PLLC**
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

8.10 Defendant Uber also engaged in oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiffs herein, so as to warrant the imposition of punitive damages under California law.

8.11 Accordingly, Plaintiffs are entitled to recovery of punitive damages against Defendant in an amount to be determined at trial.

## IX.   THIRD CAUSE OF ACTION

### Loss of Consortium

9.1 Plaintiff incorporates herein by reference and makes a part hereof as though fully set forth herein, in the First through Fourth Causes of Action of this Complaint.

9.2 Plaintiff Adrienne Walker is now, and at times herein mentioned, the lawfully wedded spouse of Brian Gorne.

9.3 As a direct and proximate result of the acts of Uber, and the severe injuries caused by Defendant to Plaintiff Gorne as alleged in this Complaint, plaintiff Adrienne Walker has suffered, and for a long period of time will continue to suffer loss of consortium, including but not by way of limitation, loss of services, marital relations, society, comfort, companionship, love and affection of her said spouse, and has suffered severe mental and emotional distress and general nervousness as a result thereof.

9.4 Plaintiff Adrienne Walker, as a result of the foregoing described injuries to her Spouse, Brian Gorne, has been generally damaged in a sum in excess of the jurisdictional limits of the District Court.

9.5 WHEREFORE, plaintiff prays judgment against UBER as hereafter set forth.

## X.   DAMAGES

10.1 Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

10.2 As a direct and proximate result of Defendant's tortious conduct and breach of duties as set forth herein, Plaintiffs are entitled to be compensated for their damages.

WEINSTEIN CAGGIANO PLLC
601 UNION STREET, SUITE 2420
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

10.3 Plaintiffs further reserve and hereby claim all other rights and remedies arising from Plaintiffs injuries.

10.4 All of Plaintiffs damages are in an amount which will be provided at trial.

## XIV.   PRAYER FOR RELIEF

11.1 WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendant, containing the following relief:

A.      Awarding Plaintiffs compensatory damages in excess of the jurisdictional amount, including, but not limited to past and future pain, suffering, emotional distress, disability, loss of enjoyment of life and other non-economic damages and losses;

B.      Awarding Plaintiffs their economic damages and losses, including without limitation past and future medical expenses, out of pocket expenses, lost earnings and lost earning capacity, lost household services, and other economic damages in an amount to be determined at trial.

C.      Awarding Adrienne Walker damages for her loss of consortium.

D.      An award of punitive damages; and

E.      Such other and further relief as the Court may deem just and proper.

DATED this 23rd day of July, 2019.

WEINSTEIN CAGGIANO PLLC

*s/ Alexandra Caggiano*
*s/ Brian Weinstein*
Brian D. Weinstein, WSBA No. 24497
Alexandra B. Caggiano, WSBA No. 47862
601 Union Street, Suite 2420
Seattle, Washington 98101
Telephone: (206) 508-7070
Facsimile: (206) 237-8650
Counsel for Plaintiffs